**UNITED STATES of America,**
**Appellee,**

**v.**

**Henry Gregory VARLACK, Samuel Kavalauskas and David Bernard Roche,**
**Defendants-Appellants,**

**and**

**James Thomas Moock, Clifford Carter**
**and Lawrence Wagner,**
**Defendants.**

**No. 348, Docket 23606.**

United States Court of Appeals
Second Circuit.

Argued June 15, 1955.

Decided Aug. 25, 1955.

666

J. Edward Lumbard, U. S. Atty., for the Southern District of New York, New York City (Peter M. Brown, New York City, of counsel), for appellee.

John T. Sullivan, New York City (Vine H. Smith, Brooklyn, N. Y., and Arthur J. Cilento, New York City, of counsel), for defendants-appellants, Varlack and Kavalauskas.

Waldman & Waldman, New York City (Louis Waldman, Seymour M. Waldman and Martin Markson, New York City, of counsel), for defendant-appellant Roche.

Before CLARK, Chief Judge, and MEDINA and HINCKS, Circuit Judges.

MEDINA, Circuit Judge.

This appeal by defendants Varlack, Kavalauskas and Roche raises various questions relative to the validity and interpretation of 18 U.S.C. § 1951, commonly referred to as the Hobbs Act or the Anti-Racketeering statute. The indictment contained two counts, the first charging all three with conspiring to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion, specifically, by using their positions in the International Longshoremen's Association to obtain property from the American Sugar Refining Company by the wrongful use of threatened force and fear, in that they threatened to cause and prolong work stoppages in the unloading of raw sugar from ocean going vessels at a pier owned and operated by the company in the port of Philadelphia, Pennsylvania, unless payments were made; and the second, charging defendant Roche with the offense of obstructing, delaying and affecting commerce and the movement of articles and commodities in commerce by extorting from an agent and representative of the American Sugar Refining Company, a sum of money, the payment of which was induced by the wrongful use of threatened force and fear. Roche was acquitted on the first count and found guilty on the second; Varlack and Kavalauskas were found guilty as charged.

All three defendants assert that the evidence adduced at the trial was insufficient to support the jury verdicts. The position taken by the defendants here, as was their defense at the trial, is predicated primarily upon the claim that there had been no extortion, but rather that the agents and representatives of the American Sugar Refining Company, the alleged victim of the extortion, had sought to bribe these defendants in their capacities as labor officials, in order to avoid labor strife which was expected to, and did, result from proposed reductions in the labor force occasioned by mechanical innovations introduced by the company at its Philadelphia pier to facilitate the unloading of ships bringing sugar from the Caribbean.

The factual background out of which this prosecution arose is simple. In conjunction with the completion of its newly constructed pier adjoining its Philadelphia refinery, the American Sugar Refining Company, sometime in 1951, prepared to introduce certain mechanical devices for the unloading of raw sugar from its ships. Prior to this time, the sugar, both in bags and in bulk, was unloaded by hand. It became quite apparent that the new methods which the company contemplated introducing would effect a substantial reduction in the labor force necessary to unload the sugar, and, although it claimed the exclusive right under its agreement with the International Longshoremen's Association to determine the manpower necessary to unload the ships, the company saw fit to discuss the prospective change in manpower needs with the local representatives of the union. At the outset of the talks, defendants Varlack and Kavalauskas, the local labor delegates and "leaders" representing the longshoremen, took the position that they would not accede to any reduction in work force regardless of the terms of the contract and admonished the company's representatives that they had better "cooperate" or there would be "trouble." Shortly thereafter, Varlack and Kavalauskas, when asked what they meant when they used the word "cooperation" stated: "Well, we mean this, that you give each of us $2,500 and each of us a Chevrolet car, and that you place each of us on the payroll at $50 a week". When these demands were refused by the company representatives, these two defendants stated that a ship carrying raw sugar in bags, which was expected to arrive shortly, would not unload "unless we are taken care of." The company consented to pay Varlack and Kavalauskas $1,000 each and the ship was unloaded without any difficulty.

As the arrival of the first ship carrying sugar in bulk became imminent, Var-

lack and Kavalauskas made further demands, both in New York and in Philadelphia, and they indicated that unless their demands were met there would be "no unloading of sugar in bulk." About a week before the cargo of bulk sugar reached Philadelphia, the company representatives were informed by the business agent of the local union that he had attended a meeting in the office of Joseph P. Ryan, President of the International Longshoremen's Association, in New York, at which Ryan had said that "the ship will not discharge with less than 31 men per gang." The next day, September 12, 1951, Varlack and Kavalauskas demanded and were paid $1,500 to attend a prize fight in New York with other union delegates.

At this juncture, in the midst of negotiations with the union representatives, the company executives were told to contact Ryan in New York and that "whatever he decides the union will abide by." It is against this background that Roche enters the case, as the conference with Ryan in New York resulted in Ryan's designating Roche to go down to Philadelphia and settle the matter.

Before the difficulties were resolved, a strike was called and the pier was shut down. After the deadlock had persisted for several days, Roche spoke to one of the company representatives and made the statement that the situation looked "very serious" and that he did not believe the company would be able to break the strike "unless something is passed around." The company offered Roche $1,000 and this was rejected, Roche indicating that it was too small a sum. Finally, the company offered $7,500, $2,500 for Roche and $5,000 for Ryan, to be paid immediately after the termination of the work stoppage, and Roche indicated that these terms were acceptable.

Several days later, Varlack and Kavalauskas demanded money for "other delegates" and indicated that if it was paid, work would resume and the differences would be submitted to arbitration. The company acceded and the work stoppage

ended. The next day, Roche was paid the $7,500.

There was accordingly substantial evidence from which the jury might have inferred that defendants seized upon the opportunity presented by the longshoremen's hostility to the company's introduction of technological improvements on its pier, to line their own pockets by implanting in the minds of the company officials the idea that unless and until the tribute demanded was paid to the defendants, the company's ships would not be unloaded. Whether these defendants did, in fact, have complete control over the members of the local is of little moment so long as there was evidence to support the jury's finding that the defendants' actions and words were intended to and did put the company officials, from whom the tribute was exacted, in fear that the failure to comply with the defendants' demands would result in work stoppages and in the indefinite prolongation of any work stoppages which had already occurred or might occur.

It is unnecessary to elaborate further on the voluminous proofs adduced during the course of an 8-day trial. Suffice it to say that there was sufficient evidence to warrant the submission of the questions of fact and of credibility to the jury.

The next major contention made by appellants is that the Hobbs Act, under which this prosecution was brought, does not proscribe situations in which the pressure brought upon the prospective payee is fear of economic loss, but rather, was intended to apply solely to cases involving violence, force, or threats of physical injury to person or property and fear of such injury. An elaborate effort is made to bolster this view by alluding to statements made by various members of the Congress during the course of the debates which preceded the passage of the Hobbs Act. These statements and the committee hearings disclosed a congressional awareness of the inadequacy of the earlier legislation which the Supreme Court, in United

States v. Local 807, 1942, 315 U.S. 521, 62 S.Ct. 642, 86 L.Ed. 1004, declared had excluded from the scope of its proscription certain terrorist activities of various Teamsters locals, the purpose of which was to require employers to use only union personnel to do certain jobs or to require that wages be paid to such personnel even if the employers chose not to avail themselves of the services proffered. The Congress evidently believed that the exemption given labor under the prior act, as construed by the Supreme Court, was too broad and that some restraints were necessary to deter labor groups, as well as others, from engaging in such practices. Undoubtedly, the elements of violence present in the Local 807 case were a significant part of the background against which the Hobbs Act must be interpreted. It is equally clear that it was not the intention of the Congress to interfere with the exertion of peaceful economic pressures by a union through the medium of strikes to achieve legitimate labor objectives. But it does not follow from either or both of these premises that only violence or threats of violence are covered by the Act and that the Act is not violated when union leaders or representatives obtain or attempt to obtain personal enrichment by using their positions and apparent influence to instill in the minds of the employers with whom they deal a fear of work stoppages or of the prolongation of strikes. Such activity was violative of the 1934 Act, see Nick v. United States, 8 Cir., 1941, 122 F.2d 660, 138 A.L.R. 791, certiorari denied 1941, 314 U.S. 687, 62 S.Ct. 302, 86 L.Ed. 550; Compagna v. United States, 2 Cir., 1944, 146 F.2d 524, certiorari denied 1945, 324 U.S. 867, 65 S.Ct. 912, 89 L.Ed. 1422, and constitutes a violation of the Hobbs Act, Bianchi v. United States, 8 Cir., 1955, 219 F.2d 182, certiorari denied 1955, 349 U.S. 915, 75 S.Ct. 604; see also Hulahan v. United States, 8 Cir., 1954, 214 F.2d 441, certiorari denied 1954, 348 U.S. 856, 75 S.Ct. 81.

In our view, the omission from the Hobbs Act of the word "coercion" which appeared in the predecessor statute [1] does not evidence a legislative purpose to exclude from the coverage of the statute any situation other than one involving fear induced by threats of force or violence. The key words of the statute, 18 U.S.C. § 1951(b) (2), are "actual or threatened force, violence, or fear," in the disjunctive; and appellants would have us construe these words as though they read "force, violence, or fear thereof." The conclusions reached and the reasons given in support thereof by the Court of Appeals for the Eighth Circuit in Bianchi v. United States, supra, with respect to the scope and constitutionality of the Hobbs Act are convincing and we agree with them. The terms of the present statute are no more vague than those of its predecessor. See Nick v. United States, supra; Compagna v. United States, supra.

Defendant Roche assails the sufficiency of the indictment on the ground that Count II, the only count on which he was found guilty, failed to allege that the defendant's conduct "affected interstate commerce" and failed to allege "any facts showing that appellant practiced the wrongful use of actual or threatened force or fear." Specifically, defendant claims that the indictment, by referring to "commerce" and omitting to include the words "interstate or foreign," and by neglecting to include in Count II a description of the nature of the actual or threatened force or fear used, is fatally defective. There can be no doubt that

[1] "Sec. 2. Any person who, in connection with or in relation to any act in any way or in any degree affecting trade or commerce or any article or commodity moving or about to move in trade or commerce—

"(a) Obtains or attempts to obtain, by the use of or attempt to use or threat to use force, violence, or *coercion*, the payment of money or other valuable considerations, or the purchase or rental of property or protective services, not including, however, the payment of wages by a bona-fide employer to a bona-fide employee." (Italics supplied.) 48 Stat. 979–980, 73rd Cong., 2d Sess.

congressional jurisdiction to enact this statute is bottomed upon the powers conferred upon the national legislature by the Interstate and Foreign Commerce Clause of the Constitution, Art. 1, § 8, cl. 3. It is equally clear that by defining the word "commerce" as used in the act to include only interstate and foreign commerce, the legislature acted within the bounds of its constitutional authority. The indictment might well have contained a reference to the nature of the commerce affected and to the other clarifying details suggested by the appellant. The question before us, however, is not whether the indictment filed is, in all respects, the best that could have been drafted but rather, whether the omissions alluded to so completely denuded the charges of so much informative data as to deprive appellant of his right to be apprised of the charge he was required to meet and to be protected against being tried twice for the same offense. This test is a practical one and one which may be met despite the fact that the indictment could have been made more definite and certain.[2] We are satisfied that the indictment filed did fulfill at least these minimal requirements. Indeed, more than a year passed between the filing of the indictment and the commencement of the trial. Had the appellant been unaware of the nature of the commerce charged to have been affected, he had ample opportunity to request that

information, but he did not. Moreover, Roche was named in Count I as well as in Count II, and the identity of dates and victims as well as the reference to Roche's position in the union served to inform him that the subject matter of both counts was substantially the same. This being so, the additional data contained in Count I relative to the commerce affected, viz., the unloading of raw sugar from ocean going vessels at a pier owned and operated by the American Sugar Refining Company in Philadelphia, Pennsylvania, and the nature of the threatened force and fear wrongfully used, viz., threats to cause and prolong work stoppages unless payments were made, supplied the desired information and should have resolved any lingering doubts which Roche may possibly have had regarding the offense with which he was being charged.

Defendants Varlack and Kavalauskas insist that the trial judge erred in failing to submit to the jury the question of whether these defendants had conspired to obstruct, delay or affect commerce. It is urged, inter alia, that such was the effect of his refusal to charge in accordance with defendants' requests Nos. 8[3] and 9[4] and of his instructing as follows:

> "I charge you, as a matter of law, that if you believe the testimony of the Government's witnesses with reference to the Federal jurisdictional element of interstate com-

---

2. See Hagner v. United States, 1932, 285 U.S. 427, 431, 52 S.Ct. 417, 76 L.Ed. 861; also Debrow v. United States, 1953, 346 U.S. 374, 74 S.Ct. 113, 98 L.Ed. 92.

3. 8. These defendants, Varlack and Kavalauskas, are charged with the crime of conspiring to obstruct and interfere with commerce by extortion. They are not charged in this indictment with the crime of extortion. Unless both the conspiracy charge and the use of extortion as a means are established beyond a reasonable doubt, the verdict must be not guilty. Even if you find that these defendants, Varlack and Kavalauskas, obtained money from the representatives of the American Sugar Refining Company by making threats, such finding is not enough

to justify a verdict of guilty unless it is further established beyond a reasonable doubt that these defendants, Varlack and Kavalauskas, conspired to affect or obstruct commerce by means of such extortion.

4. 9. If in fact the longshoremen of Local Union 1291 of the International Longshoremen's Association, who handled sugar cargoes, were a militant group who could not be dominated by defendants, Varlack and Kavalauskas, and Varlack and Kavalauskas know the impossibility of such domination, it necessarily follows that Varlack and Kavalauskas could not have intended or conspired to affect or obstruct commerce and the verdict must be not guilty. In that event, they would undoubtedly have committed an offense

merce, that is to say, the Government's testimony with reference to the bringing of raw sugar into the refinery of the American Sugar Refining Company at the Port of Philadelphia, Pennsylvania, from points outside the United States, and if you believe that the defendants conspired to or did threaten to obstruct, delay or affect the movement of such sugar from the boat to the refinery in Philadelphia, Pennsylvania, then, as a matter of law, those acts would obstruct, delay, or affect commerce or the movement of articles in commerce as defined in the Act.

However, the fact that the commerce affected was interstate commerce, or that there was an obstruction of this commerce, is not alone sufficient. There are two other questions which you must consider in determining whether the Government has proven the essential elements of the charges beyond a reasonable doubt. They are:

(1) Were the acts of the defendants such as to constitute extortion or an attempt to extort, and

(2) As to the first count of the indictment, was there a conspiracy between the defendants, or any of them?"

■ We have already indicated that, in our view, the question of whether defendants could in fact, or believed they could, control the members of the local is immaterial to a determination of guilt or innocence under the Hobbs Act. Defendants' contention is apparently premised upon an erroneous conception of the kinds of conduct which the Act was designed to proscribe. An examination of the various forms taken by this legislation since the passage of the Anti-Racketeering Act of 1934 makes it clear, beyond cavil, that the Congress sought to apply criminal sanctions to acts constituting extortion or robbery or attempts

or conspiracies to commit such acts providing only, as indeed the constitutional prerequisites to legislative jurisdiction require, that the conduct obstructed, delayed, affected, or in some other way related to interstate or foreign commerce or the movement of commodities in such commerce. See Hulahan v. United States, supra, 214 F.2d at page 445.

Hence, the 1934 Act read as follows:

"Sec. 2. Any person who, in connection with or in relation to any act in any way or in any degree affecting trade or commerce or any article or commodity moving or about to move in trade or commerce—

"(a) Obtains or attempts to obtain, by the use of or attempt to use or threat to use force, violence, or coercion, the payment of money or other valuable considerations, or the purchase or rental of property or protective services, not including, however, the payment of wages by a bona-fide employer to a bona-fide employee; or

"(b) Obtains the property of another, with his consent, induced by wrongful use of force or fear, or under color of official right; or

"(c) Commits or threatens to commit an act of physical violence or physical injury to a person or property in furtherance of a plan or purpose to violate sections (a) or (b); or

"(d) Conspires or acts concertedly with any other person or persons to commit any of the foregoing acts; shall, upon conviction thereof, be guilty of a felony and shall be punished by imprisonment from one to ten years or by a fine of $10,000, or both." 48 Stat. 979–980, 73rd Cong. 2d Sess.

In the 1946 Amendment, the form was changed somewhat to read:

" 'Sec. 2. Whoever in any way or degree obstructs, delays, or affects

against the state jurisdiction and also against the National Labor Relations Act [29 U.S.C.A. § 151 et seq.] known as

the Taft-Hartley Statute, but they would not have committed the crime charged in the indictment in this case.

commerce, or the movement of any article or commodity in commerce, by robbery or extortion, shall be guilty of a felony.

"'Sec. 3. Whoever conspires with another or with others, or acts in concert with another or with others to do anything in violation of section 2 shall be guilty of a felony.

"'Sec. 4. Whoever attempts or participates in an attempt to do anything in violation of section 2 shall be guilty of a felony. * * * '" 60 Stat. 420, 79th Cong. 2d Sess.

Finally, the 1948 codification and consolidation of these former provisions, revised the language of the statute still further to read:

"(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both." Title 18 U.S.C. § 1951.

Nothing in the legislative history of either the 1946 amendment or the 1948 codification indicates a congressional purpose to effect a change in the 1934 Act in so far as it was aimed at conspiracies to extort or rob or attempts to extort or rob which obstruct, delay or affect foreign or interstate commerce. Moreover, the reviser's notes to Title 18, § 1951 indicate quite clearly that the "changes in phraseology and arrangement" were designed solely to effect consolidation.

Under the 1934 Act, it was not incumbent upon the prosecution to prove that it was the purpose of the conspiracy to affect interstate commerce. Indeed, in Nick v. United States, supra [122 F.2d 673], the court specifically held that it was proper to charge that "it is not necessary for the jury to find that the defendants, in conspiring, considered that the effect of their conspiracy would be to affect interstate commerce or that one of the purposes of the conspiracy was to affect such commerce." The court stated, "All that is necessary is that the conspiracy shall be to do something, the natural effect of which will be to affect interstate commerce."

We have no doubt that the same is true under the statute in its present form and, in this regard, we appear to be in agreement with the Court of Appeals for the Eighth Circuit which, in Hulahan v. United States, supra, 214 F.2d at page 445, sustained an instruction virtually identical with the one given by the trial judge in the instant case, and went on to state that "the activities of Hulahan, if they constituted extortion or attempts or conspiracies to extort, would necessarily have affected interstate commerce within the meaning of the statute."

■ We conclude, under our view of the applicable law, that it was proper to refuse defendants' requests to charge and to instruct the jury that if it believed the testimony of the Government witnesses with respect to the interstate or foreign nature of the commerce engaged in by the alleged victim and if it believed the testimony with respect to the conspiracy to threaten or the actual threatening to obstruct, delay or affect such commerce, then, as matter of law, the jurisdictional elements were present and the only questions left open were whether the acts of the defendants constituted extortion or an attempt to extort and whether the defendants conspired to obtain money or property by such means.

■ Defendants Varlack and Kavalauskas assert that they were deprived of constitutional rights secured to them under the Sixth Amendment because their trial was held in the Southern District of New York. This claim is based upon the dual ground that the atmosphere in New York was hostile and biased against the International Longshoremen's Association and that the interstate or foreign commerce allegedly affected as well as most of the signifi-

cant events relating to the alleged payments made and the discussions had between the defendants and the representatives of the American Sugar Refining Company, took place in the Eastern District of Pennsylvania. However defendants do not offer, nor does the record disclose, any substantiation of the claim of bias. With respect to the claim of improper venue in New York, Title 18 U.S.C. § 3237 provides that "any offense against the United States *  *  * committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." The evidence in the instant case clearly indicates that these two defendants travelled from Philadelphia into the Southern District of New York and there did acts in furtherance of plan. This is sufficient under the statute to justify their prosecution in the latter district.

The remaining miscellany of alleged prejudicial errors require little discussion. The motion for a severance as to Roche was properly denied, as the evidence would have justified a finding that Roche was a participant in the overall conspiracy to extort various sums of money from the American Sugar Refining Company in connection with the unloading of cargoes of sugar at its new Philadelphia pier. The trial judge had plainly stated that he permitted use of the pre-trial statement of the witness Wedaa in the spirit of giving the defense "every benefit of doubt" and that he had not ruled that "there is any inconsistency." Accordingly, the interruption of counsel's summation was not only proper but essential, in order to avoid a misinterpretation of what the trial judge had said when he made the direction that de-

fense counsel was entitled to examine and make use of the document. The vouchers evidencing the withdrawal of the moneys said to have been paid over to defendants were plainly made in the regular course of the company's business and "a standard part of our voucher system." The jury were properly instructed that these vouchers did not indicate that the moneys were paid to defendants and that they were "merely corroborative evidence to be believed or not believed by the jury as they see fit." Evidence of Wedaa's conversation with Gilligan, a fellow company executive, was admissible for its bearing on the state of mind of the company officials who paid the money. Nick v. United States, supra; Bianchi v. United States, supra. We find no impropriety in the comments to counsel or in the occasional questioning of government witnesses by the trial judge; nor can we discern any abuse of discretion in permitting a certain amount of discussion of law points in the presence of the jury. The criticism of certain parts of the prosecutor's summation is also unwarranted. Hard blows were exchanged as the respective advocates sought to persuade the jury one way or another. Such excess of zeal as the record discloses was more on the part of defense counsel than on that of the prosecutor; and the trial judge was quick to rectify an inadvertent inaccuracy as to the aggregate amount of money paid to the defendants, and otherwise clarify matters brought to his attention by supplemental requests. Other assignments of error are equally without merit.

The charge was scrupulously fair and in all respects accurate; and defendants had a fair trial.

Affirmed.