**UNITED STATES of America**
v.
**Nicholas A. STIRONE.**
**Crim. A. No. 14871.**

United States District Court
W. D. Pennsylvania.
Dec. 5, 1957.

Vincent M. Casey, Pittsburgh, Pa., for defendant.

D. Malcolm Anderson, U. S. Atty., Hubert I. Teitelbaum, Asst. U. S. Atty., Pittsburgh, Pa., for United States.

MILLER, District Judge.

Following trial and conviction for a violation of § 1951 of Title 18 U.S.C.A., the defendant Nicholas Stirone has filed motions for arrest of judgment, for acquittal and, in the alternative, for a new trial. The substance of the single count indictment was that the defendant, a union official, obstructed, delayed and affected interstate commerce and the movement of materials in interstate commerce by the extortion of $31,274.13 from William G. Rider. The extortion was alleged to consist of the obtaining of money by defendant's wrongful imposition on the victim of a fear of economic loss. 18 U.S.C.A. § 1951(b) (2). Rider, a supplier of ready-mixed concrete, had obtained a valuable subcontract to furnish the concrete requirements for the construction of a new plant at Allenport, Pennsylvania, for Pittsburgh Steel Corporation. The principal contractor on the project was Ragnar-Benson Company, which began construction in September 1951. Rider operated a batching plant at Belle Vernon, Pennsylvania, on the premises of the Duquesne Slag Products Company from which he was required to purchase the sand and slag aggregate used in manufacturing the concrete. According to the government contention, the defendant, in the company of Dierker, the president of Duquesne Slag Products Company, visited Rider at his batching plant shortly after September 13, 1951. It was alleged that while the three were seated in an automobile the defendant made an unlawful demand for payment of $.50 on every cubic yard of concrete furnished under the Ragnar-Benson contract as a price for Rider's continuing to hold the contract. Rider, called as a witness by the government, testified that when the demand was made he "got mad" and left the automobile after which Dierker joined him, persuading him to agree to the defendant's proposal and telling him that an adjustment would be made in the price of slag. Following Rider's consent to the proposal, defendant allegedly told him he would keep Rider out of labor trouble. Numerous checks were given to the defendant periodically from April 1952, until January 1954. The payments were entered on Rider's books as commissions. The defense countered with an alibi and with a contention that the payments represented true commissions as consideration for the defendant's agreement to use his influence with Ragnar-Benson to secure the subcontract mentioned above for Rider.

Conceding that the evidence must now be viewed in a light most favorable to the government, United States v. Migliorino, 3 Cir., 1956, 238 F.2d 7, 10, the defendant contends that the evidence produced by the government at the trial was not sufficient to support the verdict of guilty. He argues first that the alleged extortion was not shown to have affected, obstructed or delayed commerce in any substantial way and second, that the alleged extortion payments were not shown to have been made by Rider because of fear.

In the indictment it was charged that the defendant by his coercive actions obstructed, delayed and affected interstate commerce and the movement of materials and supplies—i. e., sand, in interstate commerce. It was then proved at the trial that sand used by Rider in manufacturing ready-mixed concrete and purchased from Duquesne Slag Products Company had without question been transported in interstate commerce, and secondly, that steel articles produced at the plant after construction had been transported in commerce to the centers of the appliance and automotive industries outside the State of Pennsylvania. A sufficient foundation for introduction of both kinds of proof was laid in the indictment.

Defendant's denial that interstate commerce was affected by his actions is based in part upon an argument that interstate commerce ended with the delivery of the sand in Pennsylvania; that the interstate character of the sand

was lost when it was delivered to and stored by Duquesne Slag Products Company and Rider; and that the sand lost its identity as a separate article of commerce when it was mixed with other ingredients to form a new product, ready-mixed concrete. The conclusion is said to follow that the present prosecution is founded upon a forbidden attempt to exert federal control over purely local matters—manufacture of ready-mixed concrete and the performance of a building subcontract. The answer to defendant's contention is that the power of Congress to regulate commerce is plenary and the power to regulate includes the power to protect commerce "no matter what the source of the dangers which threaten it." National Labor Relations Board v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893. Racketeering affecting interstate commerce is clearly within the federal control, United States v. Green, 1956, 350 U.S. 415, 421, 76 S.Ct. 522, 100 L.Ed. 494, and commerce may be affected even though the actual movement of goods has ceased and the character of the goods altered in the hands of the consumer. Since the act of Congress was intended to insure the free flow of articles in interstate commerce, the only criteria which this court may properly employ to determine whether the act is applicable are whether the channels of interstate commerce have been used and whether the free passage of articles therein has been threatened. The court correctly told the jury that if the government's facts were believed, interstate commerce had been affected by the conduct of the defendant. Cf. United States v. Lowe, 3 Cir., 1956, 234 F.2d 919, 922–923, certiorari denied, 1956, 352 U.S. 838, 77 S.Ct. 59, 1 L.Ed.2d 56. That statement was based upon a premise that a deliberate act which tends to prevent articles from being used once they have reached their destination after being shipped in interstate commerce dams up the stream of commerce and delays, obstructs and affects interstate commerce as surely as though the same act had cut off the supply at its source. Nick v. United States, 8 Cir., 1941, 122 F.2d 660, 668, certiorari denied, 1941, 314 U.S. 687, 62 S.Ct. 302, 86 L.Ed. 550; Hulahan v. United States, 8 Cir., 1954, 214 F.2d 441, 445, certiorari denied, 1954, 348 U.S. 856, 75 S.Ct. 81, 99 L.Ed. 675.

Defendant also urges that the "new construction" doctrine prevents consideration of the interstate shipment of products manufactured at the plant following its completion in determining whether the extortion here affected interstate commerce. That doctrine appears no longer to be controlling in cases arising under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., and the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., where it arose. Southern Pacific Co. v. Gileo, 1956, 351 U.S. 493, 76 S.Ct. 952, 100 L.Ed. 1357; Mitchell v. C. W. Vollmer & Co., Inc., 1955, 349 U.S. 427, 75 S.Ct. 860, 99 L.Ed. 1196. Nor was it considered in Hulahan v. United States, 8 Cir., 214 F.2d 441, under circumstances similar to the instant case. There is no reason for adopting so restrictive an interpretation of the act.

Aside from the question of federal jurisdiction, the issues affecting guilt under the statute are whether the victim was fearful, whether that fear was reasonable and whether the defendant knowingly made use of that fear to obtain the property of another. We turn to the argument that there was no showing that the payments were motivated by fear. "Fear" in the statutory sense of course includes a deliberately imposed fear of economic loss such as might result from an intentional interference with a valuable contract right. This proposition is well settled. Bianchi v. United States, 8 Cir., 1955, 219 F.2d 182, 189, certiorari denied, 1955, 349 U.S. 915, 75 S.Ct. 604, 99 L.Ed. 1249; United States v. Dale, 7 Cir., 1955, 223 F.2d 181, 183; United States v. Varlack, 2 Cir., 1955, 225 F.2d 665, 668–669; cf. Callanan v. United States, 8 Cir., 1955, 223 F.2d 171, 175, certiorari denied,.

1955, 350 U.S. 862, 76 S.Ct. 102, 100 L.Ed. 764; Hulahan v. United States, 8 Cir., 214 F.2d 441. It is equally clear that the subjective mental state of the victim is a relevant and important subject for testimony in determining the presence or absence of the requisite fear. Nick v. United States, 8 Cir., 122 F.2d 660, 671; Callanan v. United States, 8 Cir., 223 F.2d 171, 174. It was shown that the defendant was a responsible and important union official. During the period involved, the defendant was president of Local No. 1058 of the International Hod Carriers, Building and Common Laborers Union of America; he was president of the Heavy Engineering, Railroad, Contracting and Highway Construction Council which acted as bargaining agent for unions composed of carpenters, operating engineers, laborers and teamsters; he was chairman and spokesman for the Laborers' District Council, the bargaining agent which represented numerous unions affiliated with the Hod Carriers International. His position was known to Rider. In prosecutions under the act, the victim may testify, as did Rider, to his state of mind and motive in meeting the unlawful demand. Bianchi v. United States, 8 Cir., 219 F.2d 182–190. Rider's declarations to his wife and his conduct following his return from the alleged shake-down interview could also have been considered by the fact-finding body. 2 Wigmore, Evidence § 661 (3d ed. 1940). Under the circumstances, it was for the jury to determine whether the payments were made by Rider, as the government contended, because of fear imposed by the defendant or, as argued by defendant, because of Dierker's persuasion and statements to Rider that an adjustment would be made in the price of slag.

It is next suggested that the government's improper use of subpoenas requires the granting of a new trial. See Rule 17, F.R.Cr.P., 18 U.S.C.A. In many instances subpoenas were issued commanding the appearance of witnesses to testify in the "United States District Court for the Western District of Pennsylvania" at "633" or at "644" New Federal Building, Pittsburgh, the latter being room numbers of the offices of the United States Attorney. The procedure followed is disapproved. The validity of the subpoenas from the viewpoint of the witnesses is not in question since each took the stand and without objection gave testimony in response to the subpoena. In re Meckley, 1943, D.C.M.D.Pa., 50 F.Supp. 274, affirmed, 3 Cir., 1943, 137 F.2d 310, certiorari denied, 1943, 320 U.S. 760, 64 S.Ct. 69, 88 L.Ed. 453; 97 C.J.S. Witnesses §§ 22, 25, pp. 374, 376 (1957). Assuming that defendant has standing to object to a misuse of the subpoena power, a valid objection must be based on prejudice to his cause. The United States Attorney informs the court that the subpoenas were drawn in the form described above only to insure the keeping of proper records for the payment of witness fees. There is no averment or proof of ulterior purpose or of prejudice. There accordingly is nothing before the court to justify a presumption of injury to some substantial right of the defendant. See Rule 52(a), F.R.Cr.P., 18 U.S.C.A.

The defendant contends the admission of testimony showing other alleged unrelated offenses for the purpose of proving intent and scheme or plan was error. This evidence was elicited from the witnesses Doherty and Hawthorne. Doherty was the owner of an out-of-state demolition contracting firm and Hawthorne a former officer of another. The two firms were separately engaged in demolition projects in downtown Pittsburgh in 1952. Each witness testified that he had paid money to the defendant in that year. Doherty testified that at a pre-arranged meeting in May of 1952, the defendant demanded payment of $35,000. His story, if believed, admitted of only one interpretation—that as the price of being "a pretty cocky little guy," that is, refusing the defendant's demand, Doherty was subjected to an onslaught of labor difficulties which eventually required him to

change his mind. The payments in this instance took the form of deliveries of scrap metals from the job to a dealer for the defendant's account, the dealer, according to Doherty, having acted as a middleman in the illegal transaction. Hawthorne's testimony indicated that the defendant had asked him for the sum of $1,000, telling him the money was for "political purposes" or as on other occasions when money had been requested, for the "welfare fund." He said that he gave the money to the defendant "because I felt I had to" and "* * * I had heard that, in fact I had seen, I could look down the street and see Mr. Doherty's job, and I seen the procedure of the work, and I thought it would be best to go along with the crowd." There was further, competent testimony by Duval, an employee of the Hawthorne Company, that at Hawthorne's instructions in September 1952, he had sent $1,000 of company funds to the defendant. On cross-examination, Hawthorne testified that no threats were made by the defendant and that he did not think he had been "shook-down." Defendant argues that the government was bound by the assertion of its own witness that there had been no shakedown. This is not the case. While the witness' notion, on cross-examination, of a shakedown was relevant, it was not conclusive. The government is not bound by the testimony of prosecution witnesses. The jury is free to believe part of what a witness says and discount the rest. United States v. Gordon, 3 Cir., 1957, 242 F.2d 122, 126, certiorari denied, 1957, 354 U.S. 921, 77 S.Ct. 1378, 1 L.Ed.2d 1436; cf. United States v. Frank, D.C.W.D.Pa.1956, 151 F.Supp. 866, 873, affirmed, 3 Cir., 1957, 245 F.2d 284, certiorari denied, 1957, 355 U.S. 819, 78 S.Ct. 25, 2 L.Ed.2d 35. If the direct testimony of the witness did not completely establish an extortion, it tended to do so, which was all that was required to justify its admission for the purpose of showing intent or plan. Cf. Commonwealth v. Heintz, 1956, 182 Pa.Super. 331, 336, 126 A.2d 498, 501.

Situations are frequently so well understood that words are unnecessary. In brief, there may be an extortion although no express threat is made. Cf. Callanan v. United States, 8 Cir., 223 F.2d 171, 175–176.

Defendant would concede the proposition that evidence of the commission of similar and related offenses tends to show "a consistent pattern of conduct highly relevant to the issue of intent." Nye & Nissen v. United States, 1949, 336 U.S. 613, 618, 69 S.Ct. 766, 769, 93 L.Ed. 919. Citing Farkas v. United States, 6 Cir., 1924, 2 F.2d 644, he denies that criminal intent was in issue since, it is argued, the crime under 18 U.S.C.A. § 1951 consisted of the obtaining of money by the making of threats of economic loss and did not depend on the actor's intent. However, there is no question that intent was an ingredient of the offense charged even though the term is not employed in the statute. Morisette v. United States, 1952, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288; see United States v. Varlack, 2 Cir., 225 F.2d 665, 668. Evidence of other offenses was not, in the present prosecution, admitted during the case in chief but on rebuttal after the defendant had admitted the receipt of money from Rider. He had explained the transaction as a business arrangement and corroborative testimony was offered to support his explanation. Since the transfer of money was conceded, and in itself innocent, evidence of the defendant's intention was material in determining whether his or the government's theory should be accepted. 2 Wigmore, Evidence §§ 302, 352(2), (3d ed. 1940); United States v. Blount, 2 Cir., 1956, 229 F.2d 669, 671–672. Defendant also argues that if the testimony of the prosecution witness was to be believed at all, the necessary evil intent was established and there was no need for cumulative evidence on this issue. Nevertheless it was not improper to receive the evidence of other offenses as rebuttal in the circumstances of this

case. Cf. Harper v. United States, 1956, 99 U.S.App.D.C. 324, 239 F.2d 945, 947.

It is also urged that the evidence was not admissible to show scheme or plan, the other purpose for which it was admitted. Evidence of another criminal act is admissible for such a purpose "if it is so related to or connected with the crime charged as to establish a common scheme or purpose so associated that proof of one tends to prove the other, or if both are connected with a single purpose and in pursuance of a single object \* \* \*." Bracey v. United States, 1944, 79 U.S.App.D.C. 23, 142 F.2d 85, 88, certiorari denied, 1943, 322 U.S. 762, 64 S.Ct. 1274, 88 L.Ed. 1589. Defendant's only objection to the court's instruction with respect to the testimony of other offenses was that there was no similarity or scheme shown by the evidence.[1] We disagree. The defendant's own statements reported by Doherty revealed an overreaching plan to compel the payment of money by employers. The statements that "you know I have a price tag of $35,000 on that job" and that "the contractors here and myself have made an agreement that there is a $35,000 take on this job," fairly disclose that the defendant followed a course of conduct of placing price tags on various jobs within his jurisdiction. The necessary showing of "plan" requires substantial similarity of offenses, not identity. Here there is propinquity of time and place; those who employed local labor were the victims; it could be conclusively found that the payment of money was motivated by fear of economic loss in each instance. There is a sufficient "concurrence of common features." 2 Wigmore, Evidence § 304 (3d ed. 1940). Only in the Hawthorne case was there no evidence of the direct making of threats. This court is satisfied that the evidence of the multiple instances described above in light of the defendant's statements discloses that the acts charged in

the indictment were undoubtedly part of the same determined plan for the levying of tribute. Cf. United States v. Wall, 7 Cir., 1955, 225 F.2d 905, certiorari denied, 1956, 350 U.S. 935, 76 S.Ct. 307, 100 L.Ed. 816; Commonwealth v. Hradesky, 1951, 170 Pa.Super. 24, 84 A.2d 393, 395–396.

The defendant contends further that evidence of other crimes may be introduced to show scheme or plan only when the doing of the act is in issue and that in this instance the act was conceded. See 2 Wigmore, Evidence §§ 300(3), 304. However, that was far from being the case. Defendant admitted the payment of money and a business meeting. These concessions did not embrace the act alleged by the government: that of extortion initiated by the defendant at an essentially different meeting at a different time and place. There was a proper evidentiary foundation for the proof of scheme or plan.

The court rejects the contention that admission of such evidence was foreclosed by the pre-trial order of our associate Judge Herbert P. Sorg refusing consolidation of the present indictment with indictments charging the other offenses mentioned above. Consolidation of indictments may have been refused for numerous reasons; no memorandum or opinion accompanied the order. There is no basis for assuming the determination of such a pre-trial matter limited the trial court's inherent authority to admit relevant evidence in light of the circumstances arising at the trial.

The defendant argues that the court abused its discretion by permitting the government on cross-examination to range through a field of collateral, prejudicial inquiry. He concedes that having taken the witness stand, he enjoyed the same privileges but suffered the same limitations as any

---

1. Defense counsel's objection was "I except to the Court's charge as to other crimes, there being no similarity or scheme shown by the evidence." (R. 1436).

other witness. Johnson v. United States, 1943, 318 U.S. 189, 63 S.Ct. 549, 87 L.Ed. 704; United States v. Bradley, 3 Cir., 1945, 152 F.2d 425, 426. The rule is that the cross-examination should be confined within reasonable bounds to the subjects of the direct examination, Banning v. United States, 6 Cir., 1942, 130 F.2d 330, 337, certiorari denied, 1942, 317 U.S. 695, 63 S.Ct. 434, 87 L.Ed. 556, but it nevertheless extends to any matter opened up by a party whether or not the subject is strictly relevant. United States v. Lowe, 3 Cir., 234 F.2d 919, 922. Furthermore the defendant who takes the stand may have his credibility attacked in the same ways as any other witness and to that end the cross-examination is not limited to the scope of direct examination, United States v. Lowe, supra. Collateral inquiry within elastic limits is permissible for the purpose of impeaching the defendant's credibility. United States v. Manton, 2 Cir., 1938, 107 F.2d 834, 835, certiorari denied, 1939, 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012. The rulings of the court were within these limits.

■ However, the defendant says there was a violation of the rule that specific acts of misconduct not resulting in conviction of a felony or a crime of moral turpitude are not the proper subject of cross-examination for impeachment purposes. Echert v. United States, 8 Cir., 1951, 188 F.2d 336, 26 A.L.R.2d 752; but see United States v. Klass, 3 Cir., 1948, 166 F.2d 373, 376, indicating the conflict of opinion on this matter. The author in 3 Wigmore, Evidence § 982(1) suggests the examination should be confined to the trait of veracity and further that the defendant-witness is entitled to even greater protection from a possibly prejudicial inquiry into his history. §§ 891(3), 983 (4). This rule, whatever its limit, is not the one with which the court was called upon to deal, for in this case the defendant's character had been placed in issue. That subject was opened during the cross-examination of the government's witness Moreschi, the president of the international union to which Local 1058 belonged. Moreschi's testimony was offered to show "[the defendant's] position in the labor organization, what his position is, the status of the management, what the District Laborers' Council is, what they do, to show Mr. Stirone's local labor position." While the ensuing examination did indicate the defendant's authority on a local level, it did not exceed the bounds of the offer. However on cross-examination, defense counsel elicited affirmative answers to the questions whether the defendant was "a good union man" and "good for your union," a matter about which the government could not originally inquire. Michelson v. United States, 1948, 335 U.S. 469, 476, 69 S.Ct. 213, 93 L.Ed. 168. The effect of thus exceeding the scope of direct examination by venturing into the subject of defendant's union qualifications was to constitute Moreschi a defense witness as to that issue. Morgan, Basic Problems of Evidence, Vol. 1, p. 62 (1954). The government's re-examination of the witness was then pursued in a permissively leading manner to the end of requiring the witness to define his terms. In this interrogation, questions, now complained of but proper in context, were posed suggesting the commission of abusive and improper acts by defendant in connection with union control.

■ The defendant's union character was again brought in focus during his direct examination when he traced his union career from the time of his youth, presenting a very detailed picture of humble origin, growing responsibilities and principled leadership. He described the peaceful means he used in union organizing and in furnishing guidance in setting up a pattern of organization and operation for the particular union. On cross-examination, he was asked whether he had ever sent out gangs of 200 and 300 men under instructions to drive workers off the job or to use strong-arm methods and whether he had sponsored an unauthorized taking-

over of a local union in the Johnstown area. There was renewed inquiry about a dispute between the defendant's local and the international resulting in the suspension of the local, as the result of the expulsion, inferentially improper, of an individual from the union. While the cross-examination terminated the inquiry, the government made an offer to call witnesses present in the courtroom for the purpose of showing that if the questions asked were damaging to defendant's cause, they were not idle. If the matters touched on by government counsel would not ordinarily have been proper subjects of inquiry, they became so because the manner of the defendant's union activities had been opened by him. He could not then foreclose the interrogation to show that the impression he had created was false. Cross-examination as to whether he had employed unlawful or abusive methods was justified and relevant to the subject matter of the direct examination.

Further complaints are made regarding cross-examination concerning defendant's receipt of money from contractors other than Rider for the performance of services, his connection with the leasing of heavy construction equipment by his wife to local contractors, his private interest in other non-union operations and the union's payment of Mrs. Stirone's traveling expenses when she accompanied her husband on a business trip for the union. Some of these topics, for instance, the defendant's business activities, were merely elaborations of matters touched upon in direct examination since the defendant had been presented as a union man and it was open to determine that he was not exclusively of that calling. Cf. Branch v. United States, 1948, 84 U.S.App.D.C. 165, 171 F.2d 337; see also Alford v. United States, 1931, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624. The business trip was an important item in the defense bearing on defendant's alibi and he himself first brought out the union's payment of his wife's expenses. However, the matters were ob-

viously developed for the additional purpose of showing the defendant had done things which a union official should not do, thus directly affecting his character, and for reasons which have been stated were proper for that purpose. Cf. United States v. Marino, 2 Cir., 1956, 234 F.2d 118, certiorari denied, 1956, 352 U.S. 836, 77 S.Ct. 54, 1 L.Ed.2d 54.

Other errors are assigned with respect to the cross-examination as to items of income appearing in defendant's 1937 and 1938 income tax returns, his interest in a dairy farm and other matters. On these subjects, defendant was exposed to a type of detailed questioning not different from that used by his counsel in examining some of the government witnesses for the purpose as stated of testing memory. On direct examination the defendant had displayed an apparently good memory for many small, unimportant matters far removed in time from the date of the examination. The reliability of his recollection was as important in the case as was that of the government's witnesses.

The foregoing account does not exhaust the defendant's assignments of errors which he says are merely illustrative. There is no need to itemize. The court does not agree with his contention that the sole purpose and effect of the cross-examination was to humiliate and degrade the defendant and increase the probability of conviction for crimes not charged. On the contrary, the court is satisfied that the defendant was convicted of the offense laid in the indictment and that the verdict is supported by substantial, credible evidence.

There is no basis for consideration of the defendant's fifty-fourth assignment of error. On September 25, 1957, a month and three days after the expiration of the period allowed defendant for filing reasons in support of his motion for a new trial, a paper entitled "Defendant's Amendment to Motion for New Trial" was filed setting forth the following statement:

"The distribution of a handbook containing instructions for the jurors in this case was prejudicial to the defendant. On September 24, 1957, counsel for the defendant learned that Genevieve Barr, Chief Deputy Clerk of the District Court, distributed and delivered to each juror on or about June 4, 1957 a pamphlet or handbook containing instructions for jurors. The said handbook contains numerous inaccuracies which prejudiced the right of the defendant to a fair trial. United States v. Gordon, 7th C.C.A. (Major, J), July 16, 1957."[2]

The caption of defendant's paper could not cause it to relate back to the time of the filing of the original motion and supporting reasons because the limitation of time provided for in Rule 33, F.R. Cr.P., 18 U.S.C.A., is mandatory. Rule 45(b) (2), F.R.Cr.P., 18 U.S.C.A. The purported amendment must therefore be treated as a motion made on the ground of newly discovered evidence since it was not presented within the period permitted by the court during the five days following the verdict. United States v. Bertone, 3 Cir., 1957, 249 F.2d 156, 159; see United States v. Smith, 1947, 331 U.S. 469, 67 S.Ct. 1330, 91 L.Ed. 1610, rehearing denied, 1947, 332 U.S. 784, 68 S.Ct. 28, 92 L.Ed. 368. Two of the conditions which must be satisfied before the court may award a new trial on the basis of newly discovered evidence are (1) that the evidence must in fact be newly discovered and (2) that there be facts alleged from which the court may infer diligence on the part of the movant in discovering such evidence. United States v. Bertone, supra; United States v. Rutkin, 3 Cir., 1953, 208 F.2d 647, 649. By the motion, the court is told that counsel for defendant first learned on September 24, 1957, of the distribution of the pamphlet to the jurors and by a stipulation that counsel would, if necessary, so testify. This court accepts these statements as sufficient compliance with the first condition mentioned above, but it is obvious from the moving papers that there has been no showing of diligence on the part of the defendant in discovering the facts which are the basis of his motion. If it was error to distribute handbooks to the jurors, it was error to do so before the handing down of the opinion in United States v. Gordon, 7 Cir., supra. The distribution of such handbooks in civil and criminal cases has been common practice in this court for seven years and chief counsel for defendant, a distinguished, experienced member of the bar of this court, is chargeable with knowledge of its customs. The argument that the court may without regard to time award a new trial "in the interest of justice" must be rejected. United States v. Smith, supra.

Other points preserved by argument or brief do not require written analysis. The motion for arrest of judgment is denied without discussion since the sufficiency of the indictment was upheld by Judge Sorg on defendant's pre-trial motion to dismiss. TCF Film Corporation v. Gourley, 3 Cir., 1957, 240 F.2d 711. For the reasons stated in this opinion, the motion for acquittal or in the alternative for a new trial will be denied.

An appropriate order is entered.

2. 26 L.W. 2043. A petition for rehearing before the court en banc was granted on October 23, 1957. See 253 F.2d 177.