**UNITED STATES of America,
Appellee,**

v.

**Claude PALMIOTTI, Appellant.
No. 202, Docket 24635.**

United States Court of Appeals
Second Circuit.

Argued Dec. 9, 1957.

Decided April 18, 1958.

Paul W. Williams, U. S. Atty., for Southern District of New York, New York City (Herbert F. Roth and Robert Kirtland, Asst. U. S. Attys., New York City, of counsel), for appellee.

Jacob W. Friedman, New York City, for appellant.

Before MEDINA, LUMBARD and WATERMAN, Circuit Judges.

MEDINA, Circuit Judge.

Claude Palmiotti appeals from a judgment of conviction on Counts One and Two of an indictment charging violations of the Hobbs Anti-Racketeering Act, 18 U.S.C. § 1951. The substance of the crimes alleged is that on June 18, 1956 appellant attempted to extort $350; and on June 25, 1956 succeeded in extorting $190, from an agent of Robert S. MacLean, Inc., "by wrongful use of threatened force or fear." The Third and Fourth Counts charged substantive offenses of a similar character alleged to have been committed later in the same year, but on these counts appellant was acquitted. He was sentenced to two years imprisonment on Count Two, and on Count One a suspended two-year sentence was imposed, with probation of three years to commence after the expiration of the sentence on Count Two. The trial judge allowed bail pending this appeal.

The grounds of appeal are: (1) that the indictment is fatally defective; (2) that there was no evidence sufficient to warrant the submission of the case to the jury because of the alleged absence of proof that appellant threatened a work stoppage if his demands were not acceded to; (3) that it was error to show the jurors a moving picture taken by the FBI of appellant receiving the $190 alleged in Count Two; (4) that certain comments by Government counsel and by the trial judge during the prosecution's summation were improper in that they allegedly erroneously made it appear that appellant had admitted that he was guilty of the extortion of the $190, and that the motion picture in and of itself proved his guilt; (5) that appellant was deprived of a fair trial because of the allegedly erroneous admission over objection of evidence: (a) of prior acts of extortion in 1954; (b) of certain checks received to corroborate the proof of the payments alleged to have been made in 1954 and 1956; (c) of conversations with others not in the presence of appellant, and other proof received to establish the state of mind of the victim of the extortion charged in the indictment; and (6) because of the refusal to instruct the jury as requested by appellant.

It is also claimed that the requisite interference with interstate commerce is not shown, but we merely mention this in passing, as the proof was ample to satisfy the statutory requirement and the instructions of the trial judge on this subject were unexceptionable.

Peter J. Smykla was connected with Smykla & MacLean, Inc., and Robert S. MacLean, Inc., two corporations specializing in the setting of stone in construction projects in New York. Certain of appellant's dealings were with Robert S. MacLean, but he died on February 23, 1956 and Mrs. MacLean succeeded to his interests in both companies. Much of the work of these two construction concerns involved the installation of granite blocks in bridges and highways and their practice was to order their stone precut at out-of-the-state quarries to the exact dimensions they specified.

Appellant was the business agent of the Granite Cutters Union and his activities covered a wide field. But to Smykla and MacLean his interest as shown in this record was confined to individuals in appellant's union known in the trade as fitters, men whose normal occupation was to cut the stone to the proper dimensions to prepare it for installation. While there are references here and there to anchor holes in the granite, and doubtless there were times when an occasional anchor hole needed some further chiseling, this is a peripheral matter, no more than a distracting diversion from the main issues, and we shall say no more about it. The plain fact was that neither Smykla nor MacLean had any use for the fitters. There was no work for them to do. And it is equally plain that any work stoppage or strike on the construction jobs would interfere with shipments of the quarried stone from other states— and the granite ordered for the job in connection with which the $190 was paid was contracted for with the Swenson Granite Co. of Concord, New Hampshire, and was shipped on trailer trucks from Concord to the job site in New York City.

By way of background to the chronological sequence of events which we shall now briefly outline, it may be said that the simple issues presented by Counts Two and Three of the indictment, involved, as it turned out, after the motion picture apparatus was brought into the courtroom, and the activities of the FBI were revealed, a question of veracity between Smykla and appellant. Smykla testified in substance that appellant demanded $350, pointed out the large expense of hiring the unnecessary fitters, adding the pregnant comment that "there would be no trouble" if this sum was paid, and that Smykla protested and argued, finally induced appellant to reduce the tribute he demanded to $200, and that he paid the money only because he feared a work stoppage or strike if he refused. Appellant testified that he was paid $190, but insisted that the payment was entirely as a voluntary gift, and that he took the money only because "I didn't want to antagonize the man by refusing what he was going to give me." He denied that he had sought to obtain any such sum as the $350 described by Smykla. At no time did appellant advance any claim that the money was paid to him or received by him in furtherance of any legitimate purpose of his union. He simply took the money, put it in his pocket, and used it for his own personal ends. Moreover, the trial judge instructed the jury not once but several times that they could find appellant guilty of extortion only if Smykla made the payment "because of fear or because of threatened force or threats of force made by the defendant." As to the attempt to extort $350 as charged in Count One, it is too obvious for comment that if Smykla's testimony was believed appellant was guilty as charged in that count.

With this background in mind, the sequence of events, in barest outline, was as follows: in the early part of 1954 the Smykla-MacLean corporation was engaged as subcontractor setting granite on a job on the Southern State Parkway on Long Island. Appellant sought out Smykla and MacLean and told them that fitters from his union must be put on the job. When Smykla explained that the stone was precut to size and no fitters were needed, appellant produced Rule 5 of the Regulations of the Stonecutters to the effect that where the stone was cut outside of the local jurisdiction where the job was being performed "members of his local have got to be put on the job

as fitters or stand by even though we may not need them." The conversation, as testified by Smykla, proceeded as follows:

"Palmiotti: Do you know what it would cost you?

"Smykla: It isn't going to cost me anything.

"Palmiotti: You got to put them on."

Then followed a computation by appellant of the cost of the unnecessary fitters at six, seven or eight thousand dollars and a statement that "if we pay him $2000 he would see to it that no fitters would be put on the job, and there will be no trouble on the job."

Appellant was induced to reduce his demand to $1500, insisting that no other union men would come in and ask for anything, and "that he had a connection with DeKoenig in Long Island." The upshot was that Smykla and MacLean felt the pressure of the shakedown and paid up, but in installments of $400 in April, $400 in June, $350 in July and the final $350 in August, 1954. The checks evidencing these payments and the voucher notations "Union Assessment" were received in evidence, as was Smykla's testimony, over objection.

On June 18, 1956, some time after MacLean's death, appellant appeared again, sought out Smykla on a new job site where granite was being placed on the walls of a ramp constructed on the Manhattan side of the Queensborough Bridge. He told Smykla that MacLean "promised me $350 on this job if the fitters weren't put on." According to Smykla he tried hard to avoid making any payment on this occasion, but appellant said he simply had to have the money and that $350 would be a lot cheaper than having to employ the fitters that appellant could force him to take on. Finally, Smykla said that the most he could pay was $200 and that he could do this only after talking to Mrs. MacLean. Mrs. MacLean testified that she authorized the payment of this $200 because they had been forced to make similar payments in the past and she was afraid "that they could pull the other men off the job." After several telephone calls by appellant Smykla went to the FBI and FBI agents witnessed and took motion pictures of the meeting between Smykla and appellant at the job site on June 25, 1956 when the $190 was paid over to appellant. The payment was evidently short $10 through Smykla's inadvertence. Smykla testified that he received no assurances from the FBI at any time to the effect that they could protect him from labor trouble, and he insisted that he made the payment subsequent to going to the FBI because he was afraid of a work stoppage on the job due to picketing inspired by appellant.

▆ We find no error in the refusal to charge the jury as requested, as request No. 26 contained technical imperfections and both request No. 24 and request No. 26 [1] had been substantially covered in the instructions as given. These instructions carefully delineated the simple issues involved and the trial judge at all times throughout the trial protected appellant's rights with scrupulous care.

Counts One and Two of the indictment follow:

"*Count One.* On or about the 18th day of June, 1956, in the Southern

---

[1] "24. The government by its bill of particulars herein charges that the extortion or attempted extortion of which defendant is accused consisted of illegal threats to shut down the construction jobs upon which the alleged victim corporations were engaged unless useless or superfluous employees were hired or personal payoffs made to defendant. If the government fails to prove beyond a reasonable doubt that defendant made such threats, it is your duty to acquit him.

"26. The fact that certain questions were propounded to the defendant by the government's attorney implying the commission of various acts or the receipt of certain moneys, which questions defendant answered in the negative, is not to be regarded as any proof or evidence whatsoever that defendant did any of the things concerning which he was questioned, and the jury is not entitled to draw any inference therefrom unfavorable to defendant."

5

District of New York, Claude Palmiotti, the defendant herein, unlawfully, wilfully and knowingly obstructed, delayed and affected interstate commerce, and the movement of articles and commodities in interstate commerce, to wit, the transport of granite from New Hampshire to New York, by extortion and attempted so to do, in that he did attempt to obtain from an agent and representative of Robert S. MacLean, Inc., a sum of money belonging to said company, to wit, $350, with its consent, induced by wrongful use of threatened force and fear. Title 18, Section 1951, United States Code.

"*Count Two.* On or about the 25th day of June, 1956, in the Southern District of New York, Claude Palmiotti, the defendant herein, unlawfully, wilfully and knowingly obstructed, delayed and affected interstate commerce, and the movement of articles and commodities in interstate commerce, to wit, the transport of granite from New Hampshire to New York, by extortion and attempted so to do, in that he did obtain from an agent and representative of Robert S. MacLean, Inc., a sum of money belonging to said company, to wit, $190, with its consent, induced by wrongful use of threatened force and fear. Title 18, Section 1951, United States Code."

The Bill of Particulars gives the names of Smykla and Mrs. MacLean as the officers of Robert S. MacLean, Inc., who agreed to make the payments and describes the nature of the threats as:

"Illegal threats to shut down the construction jobs upon which victim corporation was engaged unless useless and superfluous employees were hired or personal pay-offs made to defendant."

■■ Despite all this appellant argues that, while the allegations of the indictment follow the language of 18 U.S.C. § 1951, the vital thrust of the indictment lies in the particular kind of "wrongful use of actual or threatened force, violence, or fear" relied upon, and that the omission to state this in specific rather than general terms is in effect the omission of the "essence" of the charge and a fatal defect. We do not find this argument persuasive. Under modern conditions, as we have already repeatedly held, "an indictment which charges a statutory crime by following substantially the language of the statute is amply sufficient, provided that its generality neither prejudices defendant in the preparation of his defense nor endangers his constitutional guarantee against double jeopardy." United States v. Achtner, 2 Cir., 144 F.2d 49, 51; United States v. Varlack, 2 Cir., 225 F.2d 665, 670. Applying this test here it is clear to us that by the dates and amounts stated in the indictment appellant is protected against any possible double jeopardy, and the trial record viewed as a whole convinces us that, with or without the details given in the Bill of Particulars, appellant could not have been prejudiced in the preparation of his defense by the generality of the allegations contained in the indictment.

■ As to the sufficiency of the evidence, appellant's argument is merely a variant of contentions we hear so often in extortion cases to the effect that, unless the threat which induces fear in the victim is spelled out in words of one syllable and in plain terms of a threat, there is no case for the jury. But common sense must be used in this class of cases as well as others. If the jury believed Smykla's testimony of what appellant said to him, it was certainly within their province to infer that appellant intended to give Smykla the impression that he was faced with the practical certainty that appellant would picket the job site and cause a work stoppage if Smykla did not accede to his demands. When appellant said "there would be no trouble" on the job if Smykla paid up, the jury had a right to infer that, if Smykla did not pay up, there would be "trouble," and the "trouble" would be a shutting down of work on the job and financial losses far

in excess of the amounts demanded by appellant. Indeed, it is not unlikely that the sort of language used by appellant in this case is more or less typical of that used in the common garden variety of labor shakedown that is now so frequently disclosed in the criminal cases in the Southern District of New York. Not only do we find the evidence sufficient to support the charge, but we also are of the opinion that the inference of a shutdown or strike unless Smykla submitted to appellant's demands was all but compelling, provided the jury believed Smykla. It is quite immaterial whether or not appellant actually had the power to picket the job and close it down.

■ We turn to the motion picture of appellant receiving the $190 from Smykla and the comments made on that subject during the summation of the prosecutor. From this record it is clear to us that the prosecution had no way of knowing whether appellant would testify in his own defense, or, if he did, whether he would admit or deny the receipt of the moneys he was alleged in Counts Two and Four to have received. But when the motion picture apparatus and the presence in the courtroom of the FBI men were observed, there could have been little doubt in appellant's mind that any denial of the receipt of the money would be futile. Accordingly, after the FBI photographer had testified to the taking of the moving picture and everything was in readiness for projection of the picture on the screen that had been set up in the courtroom, appellant's counsel objected and for the first time made a binding stipulation and concession on the record to the effect that appellant had received the money. Such an admission, even if made at the opening of the trial, would have been no bar to the admission of the motion picture, in the absence of some unusual circumstance requiring its exclusion in the exercise of a proper discretion by the trial judge. The tardy concession made here was obviously too late to be of any effect whatever, except perhaps by way of argument on summation. Moreover, the motion picture did

much more than portray the mere handing over of the currency to appellant by Smykla. It was corroboration of a high order of Smykla's testimony concerning the pressure put upon him to make the payment and of his reluctance to do so and his fear of the consequences of a refusal.

■ The incident complained of which occurred during the prosecutor's summation must be viewed in the light of the circumstances just described. The running fire of objections to the summation began when Government counsel started to argue that appellant in his testimony had flatly denied everything testified to by Smykla "where there were not specific FBI witnesses there watching what happened." There was considerable colloquy and the prosecutor very properly held his ground, saying "the very first time that any word was heard in this courtroom about the defense admitting the payment of one red cent was when we came back after a recess and there was a camera there and a movie screen there." After further colloquy, the prosecutor added, "it is only after this uncontrovertible evidence that the defendant then took the stand and tried to tell you (the jury) a story which he hoped would explain this evidence away." After pursuing this subject further the prosecutor made the following statement to which appellant's counsel vigorously objected:

> "You are sitting in a rare criminal trial indeed, a criminal trial where you have actually seen photographic examples of the very commission of the crime which then was conceded by the defendant."

No member of the jury could have reasonably construed this as a statement that appellant had admitted he was guilty of the extortion charged in the indictment. The trial judge quite properly stated that the argument of Government counsel was not beyond the bounds of reason and propriety, but that "he should confine it to the $190, as there was no movie of the $200" alleged in Count Four.

The whole tenor of the summation of the prosecutor and of the instructions of the trial judge as well was to the effect that they could not find appellant guilty as charged merely because he received the money from Smykla, but only if there was the threat of a work stoppage in the event of Smykla's failure or refusal to pay and if Smykla paid the money because he feared such a work stoppage or strike. We find no error in the handling of this incident by the trial judge.

 There is no merit in any of appellant's other contentions; they have all been disposed of by our prior rulings in other cases. The evidence of the 1954 transactions was clearly admissible both to show the state of mind of appellant and the state of mind of his victim. United States v. Blount, 2 Cir., 229 F.2d 669; United States v. Brewster, 2 Cir., 231 F.2d 213; see also Moore v. United States, 150 U.S. 57, 14 S.Ct. 26, 37 L.Ed. 996. But the trial judge instructed the jury that this evidence was received "only to prove the state of mind of the victim as induced by his dealings with the defendant," and that it "must not be considered by you as any proof of the acts charged in this indictment." The checks were records of Robert S. MacLean, Inc. and of Smykla & MacLean, Inc., kept in the ordinary course of business, and they were properly received to corroborate the testimony of Smykla and Mrs. MacLean on the subject of the making of the payments to appellant, United States v. Varlack, supra, 225 F.2d at page 673, and the trial judge so instructed the jury. Conversations of Smykla with Mrs. MacLean and with Rudy Knott, the foreman, and Knott's statement that Smykla appeared "very much upset," were relevant to Smykla's state of mind and all were properly received, United States v. Varlack, supra, 225 F.2d at page 673, as the trial judge again carefully protected appellant's rights by instructing the jury that this testimony "was admitted by me only for the purpose of showing the state of mind as to why the payments were made," and by his fur-

ther statement that it "must not be considered by you for any other purpose."

Appellant had a fair trial, and there was ample competent and admissible evidence to sustain the verdict.

Affirmed.