**UNITED STATES of America, Plaintiff,**

v.

**LOCAL 1804–1, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL–CIO, et al., Defendants.**

**No. 90 CIV 0963 (LBS).**

United States District Court, S.D. New York.

Dec. 17, 1990.

---

Otto G. Obermaier, U.S. Atty., S.D.N.Y., New York City (Chad A. Vignola, James L. Cott, Asst. U.S. Attys., of counsel), for U.S.

Thomas W. Gleason, New York City (Ernest L. Mathews, Jr., of counsel), for ILA Locals 1809 and 824.

## OPINION

SAND, District Judge.

This is an action brought by the United States pursuant to the Racketeer Influenced and Corrupt Organization statute, 18 U.S.C. § 1964 (1988), seeking, among other things, the imposition of a trusteeship on Local 1809 of the International Longshoreman's Association, AFL–CIO. The complaint alleges that members of Local 1809 were victims of extortion by various named individual defendants, who:

> obtained and attempted to obtain money and property from the membership of ILA Locals 1809, 1909, and 824, including the right of union members to free speech and democratic participation in internal union affairs as guaranteed by Section 411 of Title 29, United States Code; to loyal and responsible representation by their union officers as guaranteed by Section 501(a) of Title 29, United States Code; and to loyal and responsible representation by the fiduciaries of ILA Benefit Funds covering Local 824 members as guaranteed by Section 1104 and 1106 of Title 29, United States Code, which rights the defendants obtained and attempted to obtain from the members of ILA Locals 1809, 1909, and 824, with their consent induced by the wrongful use of actual and threatened force, violence, and/or fear, including fear of physical and economic injury; that is, among other means, the defendants did create, and attempt and conspire to create a climate of intimidation and fear which demonstrated that ILA Locals

1809, 1909, and 824 were under the control of, and acting on behalf of, La Cosa Nostra figures (Complaint ¶ 95).

Before the Court is the application of Local 1809, dated November 27, 1990, to compel disclosure, during the pre-trial deposition of Special Agent George Walker of the Federal Bureau of Investigation, of the names of the members of the Local who he alleges expressed to him, on promises of concealment of their identities, their belief that the Local was controlled by organized crime and their fear of possible retaliation if they exercised their rights as union members.

This application is opposed by the Government, which asserts that the "informer's privilege" bars the Local from learning the identity of these persons and proposes an *in camera* hearing at trial in which both the Government and the Local would submit written questions to such witnesses, whose identities would remain undisclosed. *See* Government's Memorandum of Law in Opposition to Defendant Local 1809's Request for the Identification of Government Informants and in Support of the Government's Application for an In Camera Proceeding at Trial to Take Testimony of Local 1809 Members ("Government's Memorandum").

An understanding of the issues presented by these cross-applications requires a detailed statement of how this issue has evolved during the course of prior proceedings in this case.

### A. The Motion for Summary Judgment and Prior Affidavits

In a motion argued before the Court on July 26, 1990, Local 1809 sought summary judgment on the ground that there is no evidence that its members were extorted, a concededly essential element of the Government's claim against this Local. In support of this motion, Local 1809 submitted the affidavits of 155 of its 160 present members attesting to the absence of fear on their part.[1]

On the return day of Local 1809's summary judgment motion, and in opposition thereto, the Government submitted the Declaration of F.B.I. Agent George Walker (Ex. A to the Declaration of James L. Cott, December 10, 1990).

In that Declaration, Agent Walker asserts:

3. I have spoken face to face with approximately fifteen members of Local 1809 during the course of this investigation. These discussions have occurred both *before* and since the filing of the complaint in this action. I also have received anonymous telephone calls on many occasions, particularly since the filing of this lawsuit. Local 1809's contention that the Government did not have evidence of the extortion of its members' rights prior to the initiation of this lawsuit is simply wrong.

4. The Local 1809 members with whom I have spoken have acknowledged their belief that the highest officers of their Local, and indeed, of the International Longshoremen's Association itself, are controlled and influenced by organized crime. Specifically, these members have stated their belief that their union is split between two organized crime groups, the "Brooklyn guys" or "Italians" and the "Irish" or "West side guys". Though the members are not always aware of the precise organized crime family names, my further discussions with them indicate that their references to the "Italians" and "Irish" refer to the Gambino Organized Crime Family and the Westies, respectively.

5. The union officials that these members most often refer to as connected to organized crime include John Bowers,

---

1. At oral argument on December 10, 1990 of the presently pending application, counsel for Local 1809 asserted that two of the remaining five Local members were ill and unavailable. Tr. 24.

Local 1809's counsel asserted at oral argument that Agent Walker also refers to statements made by past members "which widens the field to a lot more. How can we guess who they are?" Tr. 24. Agent Walker's declarations refer only to members of Local 1809. The expansion to include ex-members presumably occurred at Walker's deposition.

Local 1809 (and International) President, Thomas Ryan, Local 1809 Vice President, and John Potter, Local 1809 Secretary–Treasurer.

6. These individuals also have repeatedly expressed fear that they will suffer physical harm should it become known that they have spoken to, much less provided any information to, the FBI. They are aware of violence associated with organized crime and they fear for themselves and their families should their identities be disclosed. Throughout our discussions, these members appear greatly fearful that their identities will ever be disclosed. For this reason, in accordance with FBI procedures and upon the individuals' several requests, I have told the individuals that their identities will remain confidential. I have not revealed the identities of these individuals even to the United States Attorney's Office. Although the FBI is hopeful that some members ultimately will agree to testify in the future, we are involved in a sensitive stage in the process. The FBI's primary concern is for the safety of these potential witnesses.

7. These individuals also have expressed fear of economic coercion. Numerous relatives of Bowers, Ryan, Potter, Gleason, and other west side union officials are members of the Local or hold positions of authority at the ILA Funds and offices. These members have indicated that the best employment opportunities and monetary rewards go to those with family or other connections.

8. I have also spoken to members regarding the process by which the affidavits submitted by Local 1809 in support of this motion for summary judgment were procured. They have indicated that they felt coerced by the process by which these affidavits were obtained, having to execute them in front of their colleagues and the attorneys for the Local.

On September 5, 1990, Agent Walker submitted a Supplemental Declaration (Ex. B to the Declaration of James L. Cott) in response to the Local 1809 objection that his previous declaration did not explicitly "mention whether the members of Local 1809 stated that they have given up their rights under the Labor Management Reporting and Disclosure Act of 1959." Declaration, ¶ 2.

The Supplemental Declaration goes on to assert:

3. In fact, the members of Local 1809 with whom I spoke emphasized that they felt that there was no point in attempting to exercise their rights to vote freely, to run for office, or to insist on fair representation of their views. Their belief was based upon two stated fears: economic and physical reprisal.

4. First is the nature of Local 1809 members' relationship to their officers. The members of Local 1809 know, for example, that John Bowers, the President of the International Longshoremen's Association and Local 1809, is also their employer and ultimately has the power to hire and fire them. Thus, members have stated that they fear that any criticism of Mr. Bowers or his fellow officers, or any attempt to remove them from office through democratic electoral processes, could result in their sudden loss of livelihood.

5. Another fact that members of Local 1809 point to is the nature of the elections within the Local. The officers of the Local always run unopposed. There are no alternatives for the rank and file to consider. Members are aware of instances where the officers of the Local have told potential candidates for office, "you cannot run".

6. The coercion created by the structure of the Local is reinforced by the reputations of the officers of the Local and of the International. The "Brooklyn guys" or "Italians" and the "Irish" or "West Side guys" are not simply terms Local 1809 members use to refer to ethnicity and geography. Although these members may not be familiar with the terms "Gambino Family" and "Westies", the members state their belief that their officers are connected to violent criminals and that organized crime has a reputation for physical violence on the Waterfront. More than one Local 1809 mem-

ber has stated explicitly that the "mafia controls the Longshoremen's Association". As a result, these members have concluded that it is not only pointless, but potentially dangerous to oppose their officers.

7. Indeed, more than one Local 1809 member has indicated that he or she fears that they might be killed should their cooperation be disclosed. Nevertheless, the Bureau continues to seek to obtain public testimony by these members. Federal Bureau of Investigation policy otherwise prohibits our disclosure of the identities of informants without their consent. Accordingly, should the Court at some future date require testimonial evidence by Local 1809 members, we propose that the Court consider an *in camera* inquiry of such members without *either* the Government or the defendants present. United States Marshals subject to a sealing order could serve court subpoenas to compel such attendance. More than even a grand jury proceeding, this procedure places both the Government and the defendants on an equal footing, and would more likely assure that union members will feel free to state forthrightly their true beliefs.

On September 11, 1990, we denied Local 1809's motion for summary judgment. Noting that the identity of the individuals who have spoken to Agent Walker has not been disclosed, not even to the United States Attorney's Office, we cited the portion of Agent Walker's Declaration in which hope was expressed that "some members ultimately will agree to testify in the future" (Ex. A, ¶ 6). Without addressing the question of the admissibility at a trial of the Walker Declarations or their contents, we ruled that the Government had "made a sufficient showing to defeat a motion for summary judgment at this stage of the proceedings." Opinion, p. 2. We further wrote:

We deny the motion for summary judgment at this time but we do not dismiss lightly Local 1809's protestations that it should not be required to participate in a lengthy and complex trial if in fact the Government will never be able to prove

that its members were extorted. As discussed at oral argument, when discovery is complete, we will meet with the parties to take up such matters as sequence of proof and other means to enable the earliest feasible resolution of discrete issues raised by the complaint."

Opinion, pp. 2–3.

Thereafter, discovery continued, including the taking of Agent Walker's deposition, at which the informer's privilege issue again arose. In his November 27, 1990 letter to the Court, counsel for Local 1809, Ernest L. Mathews, Jr., wrote, at p. 5:

Four months have now elapsed since July 26, 1990, when the government represented to Your Honor that "at this stage we're in a sensitive negotiation process with many" of the persons Walker claims to have spoken to. July 26, 1990 Transcript at 23. The trial is scheduled to commence in less than 10 weeks with the government's pretrial order due in 8 weeks. Only 5 weeks of discovery remain. We respectfully suggest that the time has come.

If the government proposes to go to trial solely on the basis of Walker's extrapolations and characterizations—roughly what is contained in his two declarations—it should say so now. Walker has no written notes of any kind summarizing what he claims all those members said to him at numerous meetings over two years. It is inconceivable that the court would permit this kind of non-evidence to sustain the government's burden. If there is such a fatal flaw in the government's case, it would be unfair to require Local 1809 not only to sit through a lengthy and complex trial but also to engage in the effort and expense of preparing for such a trial. The next two months will be a time of intense activity and preparation. If this is all to defend against a case that cannot be proved, that should be known now, and the unnecessary effort obviated.

Similarly, if the government plans to reveal the names of the alleged victims at the last minute and/or call them at trial, it should be required to say so now

and make disclosure so that Local 1809 can exercise its discovery rights. Manifestly, the government may not invoke the informant's privilege throughout the discovery phase of the case and then waive it at the trial, after the local's ability to prepare a defense has been defeated. If alleged victims or other member witnesses are to be called, they should be identified now so that defendant can exercise its rights not only to depose them but also to follow up on their testimony by investigation and the depositions of other persons they may name.

It is apparent, however, from the Government's response to this letter that as of December 10, 1990, with a trial date set for February 4, 1991 (slightly less than one year after the filing of the complaint), the Government has thus far failed to obtain the consent of a single Local 1809 member to testify at trial or otherwise disclose his or her identity.

B. *The Government's Application For an In Camera Proceeding at Trial to Take Testimony of Local 1809 Members*

■ The Government has proposed that, pursuant to F.R.Civ.P. 31, the examination of the alleged victims of extortion be taken by written interrogatories with neither the United States Attorney's Office nor the Local knowing the identity of the persons to whom the questions are posed. Presumably, Agent Walker will be the only person, other than the witness, to know the identity of the witness. The Court would then propound to the witness the written interrogatories furnished by counsel it deems appropriate "and the court can ask follow-up questions like the French magistrate did"[2] (tr. 13). The Court would then release "a sanitized" transcript to the defendant Local, having permitted the Government to object ex parte and *in camera* to the release of portions of the answers which might disclose identity (tr. 14–15).

It is the Government's position that under Rule 104 of the Federal Rules of Evidence and by analogy to Freedom of Information Act cases, the Court could make a determination of the admissibility of such witnesses' statements. This, the Government asserts:

is a mechanism by which not only does the defendant get [the right of] cross-examination, albeit by written questions propounded in advance, but the court can pass upon the credibility of those persons that Agent Walker is relating the testimony about (tr. 15).

The Government goes on to argue:

if the court deems it inadequate for the defendants to mount a proper cross-examination, deems it inadmissible or requires release of certain information, then the government can make its argument on the basis of either just Agent Walker's testimony or convince these individuals to permit their identity to be revealed (tr. 15).

There are many problems with the Government's proposal. First, to the extent that the Government holds out the suggestion that at some point during the course of the trial itself some alleged extortion victims will consent to disclosure of their identity, it lends credence to Local 1809's objection that it not be confronted for the first time at the trial itself with such a disclosure which might require a request for a continuance to pursue further discovery. We agree with Local 1809 that any possibility of a consensual disclosure of the identities of such persons must be exhausted prior to trial, if such disclosure is ever to be made.

Second, the inadequacies of this procedure to challenge and assess credibility are apparent. The Assistant United States Attorney, the defendants and the Court will not know the identity of the witness. The defendant Local has the right to subpoena all of its members and have them reassert under oath the substance of their affidavits that they never felt intimidated or believed

---

2. This is a reference to the procedure followed in *United States v. Salim*, 855 F.2d 944 (2d Cir.1988), discussed at pp. 1153–54 *infra*.

that they were victims of extortion. The Government believes that some (more than five, *see* tr. 16) of these witnesses would be committing perjury if they so testified. The Assistant United States Attorney would not himself examine the members called by the Local about their prior perjury because, among other things, he would not know who they were. But this Court would be called upon to determine whether such live testimony taken in open court was to be believed or whether the Court found more credible the written interrogatories of some five or more of these witnesses given under a promise of anonymity.

We do not see how defendant Local 1809 can effectively cross-examine a witness whose identity is not known as to such witness's state of mind, an entirely subjective question of fact. In order to explore a witness's motive or bias for giving written interrogatory answers anonymously which contradict prior sworn statements, it would be relevant to know such data as the witness's length of employment, the nature of the position held by the witness, whether there were any other disputes or controversies between the witness and the Union leadership, whether the witness had been passed over for promotion or had some personal involvement with another defendant, and other aspects of the witness's work history. The Government would have all these questions asked in writing but would seek to prevent disclosure of those answers which might enable the Union leaders to ascertain the identity of the member. This Court would have little ability, unaided by the Government's ex parte advice, to ascertain which responses would or would not enable Union leaders to infer the witness's identity from some facially innocuous response. If the witness refused to respond to such questioning for fear of identity disclosure, the ability to conduct a meaningful cross-examination would be severely curtailed.

The Government relies primarily on *United States v. Salim,* 855 F.2d 944 (2d Cir.1988), in which a witness, whose identity was known, was in French custody and would not testify in the United States. The witness was examined by a French magistrate, in the absence of counsel for the parties, based on written questions submitted by counsel. At trial, portions of the deposition were read to the jury. The Court of Appeals for the Second Circuit upheld the conviction, rejecting both hearsay and Confrontation Clause objections. The Government argues that if this procedure is permissible in a criminal case, it is plainly permitted in a civil case such as this.

But *Salim* is quite a different case from the circumstances which would obtain where the questioner is not only not in the witness's presence but does not even know the identity of the witness. Moreover, in *Salim,* the witness, Bebe Soraia Rouhani, was an alleged drug courier who was detained at Orly Airport in Paris en route to New York after nine pounds of heroin were found in the lining of her suitcase. She told French authorities that she had been instructed to deliver the narcotics to a man named Qazi at Kennedy Airport. The defendant was arrested at Kennedy while fleeing across the terminal lobby after being asked by an undercover agent if he was Qazi and if he were meeting Bebe.

Cross-examination by written interrogatories of a known witness concerning a specific and discrete factual situation clearly does not pose the difficulties inherent in a written cross-examination of an unknown witness concerning that witness's state of mind. We conclude that the procedure proposed by the Government would not afford the defendant Local a meaningful opportunity to cross-examine these witnesses. Therefore, we proceed to consider whether, in the absence of such a procedure, the Government's invocation of the informer's privilege should be upheld.

### C. *The Informer's Privilege*

There is no question but that there is an informer's privilege which the Government may invoke where appropriate in both civil cases, *see In re United States,* 565 F.2d 19, 22 (2d Cir.1977), *cert. denied,* 436 U.S. 962, 98 S.Ct. 3082, 57 L.Ed.2d 1129 (1978), and criminal cases, *see Roviaro v. United*

*States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957).

In *Roviaro,*[3] the Supreme Court wrote of this privilege as follows:

What is usually referred to as the informer's privilege is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law [citations omitted]. The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law enforcement officials and, by preserving their anonymity, encourages them to perform that obligation.

\*　　\*　　\*　　\*　　\*　　\*

A further limitation on the applicability of the privilege arises from the fundamental requirements of fairness. Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way [footnotes omitted]. In these situations the trial court may require disclosure and, if the Government withholds the information, dismiss the action.

*Id.* at 59–61, 77 S.Ct. at 627–28.

The Court further observed:

We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance

of the informer's testimony, and other relevant factors.

*Id.* at 62, 77 S.Ct. at 628–29.

▋ In this case, the Government urges that the balance tips in favor of not requiring disclosure because (a) this is a civil case in which Confrontation Clause considerations are not present, and (b) out of court statements of alleged extortion victims are generally allowed in evidence under the exception to the hearsay rule which allows evidence of such statements to be received as to the declarant's state of mind. *See United States v. Kennedy,* 291 F.2d 457, 458–59 (2d Cir.1961); *United States v. Palmiotti,* 254 F.2d 491, 497 (2d Cir.1958). Indeed, the law permits a defendant to be convicted of criminal extortion even though the alleged victim denies at trial that he felt intimidated, if the other evidence establishes the falsity of this denial. *See United States v. DeLutro,* 435 F.2d 255, 256–57 (2d Cir.1970), *cert. denied,* 402 U.S. 983, 91 S.Ct. 1658, 29 L.Ed.2d 148 (1971). But the specific question which we now address is not whether the Government can establish a prima facie civil case absent informer testimony (*see* pp. 1157–58 *infra*), but rather whether under the circumstances of this case, the informer's privilege is properly invoked.

We put to one side those cases which, as was the case here until the Government's most recent submission, deal with invocation of the privilege during discovery proceedings as distinguished from the trial itself. *See, e.g., Usery v. Local Union 720,* 547 F.2d 525, 528 (10th Cir.) ("The government recognizes that at an appropriate time, probably in connection with a pre-trial order, it must list its witnesses [whose identity it had previously withheld]."), *cert. denied,* 431 U.S. 938, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977); *Secretary of Labor v. Superior Care, Inc.,* 107 F.R.D. 395, 397 (E.D.N.Y.1985) ("The Court is aware, however, that the privilege is not absolute and that at some point, defendant's right to prepare a defense could outweigh the need

---

**3.** In *Roviaro,* the Supreme Court reversed the conviction of an accused narcotics dealer where the Government withheld the identity of a material witness. The Court held that the fact that the defendant "was faced with the burden of explaining or justifying his alleged possession of the heroin emphasizes his vital need for access to any material witness." *Id.* at 63, 77 S.Ct. at 629.

for the privilege. This would tend to occur when the Secretary seeks to introduce witnesses that Superior Care has not yet had an opportunity to depose."), *modified*, 840 F.2d 1054 (2d Cir.1988).

We also put aside those cases in which the issue with regard to which the privilege is invoked does not go to a material issue at the trial itself. In this category lie those criminal cases which sustained non-disclosure of the identity of a confidential informant whose sole role was to provide the law enforcement officers with probable cause for an arrest or search. *Cf. McCray v. Illinois*, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967), with *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957).

Certainly distinguishable are those cases where the material facts are in fact known to the defendant and its efforts to obtain disclosure of their identity may be validly characterized as being motivated by some consideration other than a desire to ascertain matters material to the defense. *See Usery*, 547 F.2d at 528 ("The issues are simple.... The facts pertaining to each are within the knowledge of the Union.").

The Government asserts that this case falls within the category of those cases:

[T]he names of these people—the Local's members—are already in the defendant's possession. Nothing has prevented Local 1809 from canvassing its rank and file membership and conducting interviews of each member to inquire whether any of them have spoken to the FBI, and if so, what they said to the FBI. Indeed, defendant was not deterred from securing the affidavits of a majority of its membership in support of its summary judgment motion, and from deposing several other members. It is therefore wholly disingenuous for Local 1809 to come before this Court and ask for an order that the government identify the names of its own Local members. The defendant has alternative means of obtaining the information, which weighs significantly against disclosure.

Government's Memorandum at 10.

But we are afraid that it is the Government which is being disingenuous. Local 1809 has in fact utilized the most direct means of ascertaining the identity of those of its members who have allegedly told Agent Walker that they were extorted—it has asked virtually all of its members whether they felt intimidated. All available answered, under oath, that they did not. The sole remaining source of the identity of those who have allegedly told Agent Walker that they were victims of extortion is Agent Walker himself.

The Government cites *United States v. Kennedy*, 291 F.2d 457 (2d Cir.1961), for the proposition that testimony of witnesses as to what extortion victims told them concerning threats may be validly admitted to prove the victims' state of mind. In *Kennedy*, a case involving the extortion of truck drivers, Judge Friendly wrote for a panel which included Circuit Judge Smith and District Judge Watkins, sitting by designation.

Judge Friendly wrote:

The Court allowed various drivers who had paid the defendants to testify to conversations with other drivers concerning threats defendants had made to the latter, instructing the jury in each instance that the evidence was admitted not as proof of the facts but to show the victims' state of mind. Proof of the state of mind of the victim is relevant, indeed essential, to a prosecution for extortion, and this may be evidenced by the victim's own testimony at the trial, *Bianchi v. United States*, 219 F.2d 182, 192 (8th Cir.1955), or, pursuant to a recognized exception to the hearsay rule, 6 Wigmore, Evidence (1940 ed.) at 1730, by statements made by him to others. Here a considerable number of the informants themselves testified.... However, there were also instances where the victim's informant was not called and *some where he was not even named.*

My brothers think that even that testimony was properly received for the limited purpose stated by the judge, *although a trial court would have discretion to refuse such evidence where its useful-*

*ness to show the victim's state of mind was outweighed by its likely prejudicial effect on the jury,* 31 C.J.S. Evidence at 159, and cases cited, *and the victim was himself available to testify as to his own state of mind;* they believe there was no abuse of discretion in receiving the evidence here.

> In my view it was error to receive evidence of threats to informants not called as witnesses, even to prove the victim's state of mind; for his state of mind is irrelevant unless it springs from action by the defendant and the hearsay rule forbids the use of the informant's statement to show that this had occurred.

*Id.* at 458–59 (emphasis added).

One might argue that Judge Friendly's concern might be less in a case in which the source of the victim's fear may not result from one specific action by the defendant, but as a result of a long history of repression and a victim's belief in the defendants' status as members of organized crime. Also, there was no showing in *Kennedy,* at least as appears from the appellate decision, that the other victims were not available to testify, whereas in this case the victims are arguably unavailable. *But see United States v. Zappola,* 646 F.2d 48, 53–55 (2d Cir.1981) (witness's invocation of Fifth Amendment invalid and witness therefore available if reason for asserting privilege was fear of reprisal).

However, we believe that what clearly emerges from *Kennedy,* especially from Judge Friendly's reference to the trial court's discretion to exclude, is that the concern he expressed would be heightened and the balance strongly tilted in favor of exclusion where testimony as to the state of mind of unidentified informants was not merely cumulative, but rather was the sole evidence as to this essential element of the charge.

The fact that the law permits the admission into evidence of out of court declarations by extortion victims as proof of their state of mind, a basis urged by the Government for upholding its invocation of the informer's privilege, actually militates in the opposite direction. This is not a case in which the Government is entirely foregoing introduction of testimony which would merely be corroborative of other witnesses or not essential to its case. The Government must prove the state of mind of the alleged victims of the extortion. It proposes to satisfy its burden of proof as to this element of its case solely by the testimony of Agent Walker that some unidentified Local 1809 members told him that they refrained from exercising their union rights because of fear of reprisal.[4]

Assuming arguendo, and by no means now holding (*see* pp. 1157–58 *infra*), that such testimony, without more, would furnish a prima facie case as to the "victim's state of mind" element of the charge of extortion, what means are available to the defendant Local to refute this allegation? They may seek to impeach the credibility of Agent Walker that such statements were in fact made to him, but that effort would be impeded by the Government's invocation of the privilege whenever such questioning threatened disclosure of the identity of the alleged declarant. As above noted, the Local could call to testify virtually all of its members, who would disclaim having made any such statements to Agent Walker. Moreover, it appears that Agent Walker engages in what Local 1809's counsel terms "extrapolations and characterizations." *See* Letter of Nov. 27, 1990, discussed at p. 1152 *supra;* Declaration of July 27, 1990, ¶ 4, discussed at p. 1150 *supra.* Clearly the declarant's testimony as to what the declarant meant by the terms "Brooklyn guys" or "Italians" is far superior to Agent Walker's interpretation.

In these circumstances, one can hardly say that the withheld information is not highly material to Local 1809's defense.

The inability of the Government to present testimony by a member of Local 1809 whose identity is disclosed may indeed be the result of the effective stranglehold

---

**4.** The Government advises that it will offer live testimony as to the conduct of the other individual defendants who allegedly inspired that fear but that testimony relates to another element of the claim of extortion.

which organized crime members are alleged to have on this Local and its members. But this line of reasoning has grave dangers—the lack of direct evidence itself would be converted into evidence of wrongdoing. Surely, such reasoning would entirely reverse the burden of proof, which rests with the Government in this case.

We also consider the severity of the feared reprisals which allegedly include fear of being killed. We note, however, that this is not a case in which the Government is a defendant and must make a disclosure or suffer default or contempt. *Cf. In re United States*, 565 F.2d at 23–24. This is a case in which the Government has voluntarily undertaken the burden of proving an element of a charge brought against the Local.

### CONCLUSION

We conclude that the Government's proposal to submit written interrogatories to witnesses whose identities are not disclosed would not adequately protect Local 1809's right to a fair trial in a case in which an FBI agent's testimony as to what those witnesses told him would be the sole evidence as to the alleged victims' state of mind.

We further conclude that the Government may not invoke the informer's privilege with respect to the identity of such persons while at the same time relying on the FBI agent's account of their statements to sustain the Government's burden of proof as to the victims' state of mind.

We do not address in this opinion the consequences of these two conclusions for the continued prosecution of this case. Since the Government apparently has not abandoned all hope that it may be able "to convince those individuals to permit their identities to be revealed" (tr. 15, discussed at p. 1153 *supra*), it should be given another opportunity to renew these efforts in light of this Opinion. In view of the imminence of trial and the length of time which has already elapsed, we believe that January 7, 1991 would be an appropriate deadline. If by that date the Government does not advise the Court and parties otherwise, we will assume that there will be no testimony by victims at the trial.

The Government urges that extortion convictions have been upheld even in the absence of victim testimony, or even when the victims have denied being intimidated. *See United States v. DeLutro*, 435 F.2d at 257; *United States v. Spears*, 568 F.2d 799, 801 (10th Cir.), *cert. denied*, 439 U.S. 839, 99 S.Ct. 127, 58 L.Ed.2d 137 (1978). No case is cited, however, where none of the victims testified nor were they identified. It is conceivable that the Government could offer testimony of statements made by local members to persons other than Agent Walker, because such statements would not be subject to any promise of confidentiality. Were this to occur, the cases upon which the Government relies for the proposition that an extortion charge may be proven without the testimony of a victim would become relevant.

At this time we express no opinion as to what the appropriate disposition of this case as to Local 1809 might be should the Government choose to proceed in one of the two manners discussed above, i.e., convincing victims to consent to disclosure of their identities or offering proof of their fear other than statements made to FBI Agent Walker. We make reference to these possibilities, which may not be the only possible approaches, solely to indicate that the consequence of any holdings herein is not necessarily to preclude the case from going forward against Local 1809.

We wish to further make clear that this Court is *not* compelling disclosure of the identities of those who spoke to Agent Walker. In this case, unlike cases in which the Government is a defendant, *see In re United States*, 565 F.2d at 23–24, the Government is not compelled to make disclosure or suffer contempt. The consequences of a failure to make disclosure of any victim's identity we will address after January 7, 1991. Local 1809 may, if it wishes, renew its motion for summary judgment at any time thereafter.

SO ORDERED.